# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE AT KNOXVILLE
### February 27, 2024 Session

## STATE OF TENNESSEE v. HAYDEN JENNINGS BERKEBILE

### Appeal from the Criminal Court for Knox County
### No. 117131   Steven Wayne Sword, Judge

_____

### No. E2022-01700-CCA-R3-CD

_____

In this case of first impression, we consider whether a defendant can be convicted of criminally negligent homicide when he incites, encourages or coerces another person to commit suicide and whether the State of Tennessee has territorial jurisdiction over a defendant when he affirmatively reaches out to Tennessee via electronic means.  A Knox County jury convicted Defendant, Hayden Jennings Berkebile, of criminally negligent homicide after the victim, Grace Anne Sparks, shot and killed herself for Defendant's sexual pleasure while on a video call with Defendant.  Defendant argues on appeal that: (1) the evidence is insufficient to support his conviction because (a) the State did not prove that Defendant's actions were the proximate cause of the victim's death, and (b) the negligent homicide statute as construed here violates the First Amendment to the United States Constitution; (2) the State did not establish territorial jurisdiction over Defendant because he was in Indiana at the time of the victim's death and only communicated with her electronically; (3) the trial court erred in admitting an alleged hearsay statement by the investigator; (4) the trial court erred in allowing the jury to utilize a transcript of Defendant's interrogation that contained inaccurate transcriptions; (5) cumulative error requires a new trial; and (6) the trial court erred in denying judicial diversion because it relied on evidence not in the record.  After reviewing the parties' briefs and oral arguments, the record, and the relevant law, we affirm in all respects.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed

TIMOTHY L. EASTER, J., delivered the opinion of the court, in which ROBERT W. WEDEMEYER, J., joined.  CAMILLE R. MCMULLEN, P.J., filed an opinion concurring in part and dissenting in part.

Eric Lutton, District Public Defender; and Jonathan Harwell (on appeal) and Keith Lowe (at trial), Assistant Public Defenders, Knoxville, Tennessee, for the appellant, Hayden Jennings Berkebile.

Jonathan Skrmetti, Attorney General and Reporter; Garrett D. Ward, Senior Assistant Attorney General; Charme P. Allen, District Attorney General; and Hector Sanchez and Rachel Hill, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

### *Factual and Procedural History*

#### *Defendant's and the Victim's Relationship*

Defendant and the victim met on Omegle[1] around 2013. At the time, Defendant was between twenty and twenty-one years old and the victim was between thirteen and fourteen years old. The two had a mostly virtual on-again, off-again relationship, spanning almost six years. Defendant was married when he and the victim began their relationship, but he told the victim he was not married. The victim stopped talking to him once she discovered he was married, but they later rekindled their relationship.

Their relationship, however, was a more dark, villianous tale than even their age gap at their meeting might suggest. Defendant and the victim initially bonded over their mutual suicidal ideations, but their relationship was primarily sexual, marked especially by Defendant's control over and manipulation of the victim. Defendant and the victim likely engaged in virtual sexual activity at some point while the victim was underage. Defendant and the victim were both in other romantic relationships during their relationship with each other: Defendant was married, and the victim was engaged or dating. Neither, however, considered themselves to be monogamous, and their respective romantic partners apparently approved of their relationship with each other up to just before the victim's death.

They communicated primarily via Facebook Messenger in the months leading up to the victim's death, but also via video call, text messaging, Snapchat, phone calls, and in person when the victim went to Indiana one time to visit Defendant in the summer of 2019. Central to this case is their engagement in "suicide play," where the victim would pantomime committing suicide for Defendant's sexual pleasure.

---

[1] Trial testimony established that Omegle was an online chat website that randomly connected anonymous users in one-on-one video chat sessions. *See also* Daysia Tolentino and Kat Tenbarge, *Omegle, the Anonymous Video Chat Site, Shuts Down After 14 Years*, NBC News (Nov. 9, 2023), https://www.nbcnews.com/tech/social-media/omegle-shut-down-did-why-leif-k-brooks-shutdown-alternatives-rcna124393.

*Defendant's and the Victim's Messages*[2]

On August 5, 2019, Defendant and the victim engaged in suicide play. The victim told Defendant that she wanted to shoot herself and said she was "very disconnected from reality." Breaking from the role play, the victim asked Defendant whether he was okay. Defendant told the victim that he was in the bathroom masturbating to their conversation about the victim killing herself. Defendant said, "Like. I know I dont [sic] want you to die. But right now it's the sexiest f[***]ing thing in the whole world[.]" Defendant informed the victim, "I have one requirement . . . . I get to watch[.]" Defendant told the victim that he would not let her die if he could not watch.

On August 14, 2019, the victim was having, as she described, a "meltdown," though the messages are unclear as to why. She apologized to Defendant for being so "damaged[.]" Defendant tried to encourage her, saying that he was damaged, too. He said, "I have an undying lust to cause pain, flashback nightmares, random a[**] depression and withdrawal[.]" That evening, the victim told Defendant that she was going to cut herself. She described the feeling she got from cutting herself as being "like f[***]ing drugs. It has an up then down[.]"

Defendant and the victim engaged in sexual banter on August 19, 2019. The victim had sent Defendant pictures of herself in her underwear, and the two joked about the victim being hired at Hooters. After the victim sent a picture of her cleavage, Defendant said, "Hired[.] You are now my slave slut[.]" He clarified that "[she had] had the job forever[,] [Defendant] just wanted to rehire [the victim.]" The victim asked whether she would get a "raise" upon her "rehiring." When Defendant said no, the victim said, "Here's my 2 weeks[.]" Defendant said, "Carfull [sic] I'll make you play [R]ussian roulette again[.]" The victim said, "I know where the bullet is[.]"

On August 20, 2019, the victim offered that Defendant could watch her use a sex toy while she played Russian roulette. The victim told Defendant that she "[could not] wait for [Defendant] to extreme belt [her.] Hurt [her]. Cut [her]. Brand [her]." Defendant told the victim he wanted to "destroy" her: "Like bad destroy[.] Like stab [her breasts.]"

---

[2] At trial, the State introduced over ten thousand Facebook messages between Defendant and the victim from the months leading up to the victim's death. Two representatives from the State read the messages in their entirety to the jury over two days of trial, and an electronic document containing all of their messages was admitted at trial. Most of the messages were of a mundane nature, e.g., discussions about car trouble, pets, laundry, and family problems. Many, however, were discussions about sex, the specifics of which are addressed below. The messages discussed here are to provide context for their relationship and for the victim's death on September 29, 2019.

Defendant asked the victim, on the morning of August 23, 2019, if she wanted to "end for [him]," which meant engaging in suicide play. The victim sent Defendant a picture of herself, topless, with a revolver pointed in her mouth and her finger on the trigger. She told Defendant it was "[s]till loaded from Russian roulette[.]" Defendant said, "Do you want it?" The victim replied that she did and said, "[I'll] die for you this evening[.] . . . I want to end myself[.]" Defendant said, "Do you want me to let you?" The victim said, "I'm suicidal for real [Defendant.] Be careful with the question[.]" Defendant ordered the victim to answer his question, to which she replied that she wanted him to let her kill herself. The messages reflect that the victim tried to video call Defendant, but he did not answer.

That evening, the two discussed a video the victim sent Defendant over Snapchat,[3] which the victim described as "f[***]ed up[.]" The victim told Defendant that she had masturbated. Defendant asked the victim whether she felt better, to which she replied that she did not think she would kill herself, but "thought [Defendant would] like seeing the blood drip though. Super hot," apparently referring to the Snapchat video. Defendant agreed that he liked seeing the blood drip and that it was "[v]ery hot." The victim told Defendant she had considered killing her dog and then herself, but decided against it. She told Defendant she would probably cut herself later. Defendant encouraged the victim to go to sleep. Continuing into the early morning hours of August 24, 2019, the victim told Defendant that she was "all set" to kill herself before Defendant called her.

On August 25, 2019, the victim sent Defendant a photo of a new futon she had bought. The following exchange occurred:

The victim: The box is big enough to bury me in

Defendant: . . . kinky?

The victim: Yes

The victim: [sent a picture of herself in the box]

The victim: I just lay down and curl up and fit very well. Fun breath at box. Like a coffin

Defendant: Duper [sic] kinky

---

[3] This video is not contained in the record.

The victim said she had to throw the box away because she had no space for it in her apartment. Defendant told her that she could get an empty refrigerator box from a hardware store, which he said he did frequently as a child. The victim said, "You can tape me in that one and suffocate me. Gag. Ears plugged. Box taped completely shut. That is a total mind f[***]." Defendant commented that this idea was "kinky," and the victim said she was aroused. Later that evening, she told Defendant that they could play Russian roulette the next day. She sent Defendant several photographs of her breasts with bleeding cuts on them.

On August 27, 2019, Defendant asked the victim what her "numbers" were. By this, he was asking how depressed and suicidal she felt; the two used this system for the victim to convey how she was feeling. The victim told Defendant that she was a "6" on the depression scale and an "8" on the suicidal scale. Defendant asked the victim whether she was feeling better than she was the other day; she said that she was better, but not much. Defendant said, "Good enough for me to use you?" Defendant said that he wanted to "use" the victim and that he had been aroused since the previous morning. The victim said, "[Y]ou'll still be here for me after you use me?", and Defendant replied that he would. Defendant told the victim to "go get everything" and then to call him on another app. The victim asked if he wanted to "push" first, saying, "You can be mean[.]" In the early morning hours of August 28, the victim sent Defendant pictures of bruises on her legs from her dance classes. The victim asked Defendant if he liked her bruises, to which he replied he did. The victim said, "Good. I'll get lots more[.] . . . I can't wait for you to see me. And give me those bruises[.] Maybe on my [breasts]/ribcage[.]" Defendant replied, "That will be lots of fun[.]"

On August 30, the following exchange occurred between Defendant and the victim:

The victim: Am I just your whore. Or am I other thing

Defendant: Hahah. I'm in a mood. A very aggressive mood. I'm very bloodthirsty. I want to kill you. I'm just warning you

The victim: I don't want to be seen as just a toy again

Defendant: Okay. I should go calm down amd [sic] then talk this out with you. I'm not in a good headspace to reassure you rn [right now] little one

The victim: I don't know [i]f I can handle blood thirsty rn [right now]. I'm tired[.] Okay daddy[.] I'm sorry

- 5 -

The victim told Defendant that she was an "8" on the depression scale and a "7" on the suicidal scale.

That same morning, the victim told Defendant that he was her "good man," her "best friend," and that he made her happy. She said that Defendant was the only one who could talk her out of her bad moods or her depression. She told him that he helped calm her anxiety and helped her to think rationally. She said, "I cant [sic] live my life without you in it. Best dog parent I know. Best protector. And you're pretty good in bed[.]" After sending several more messages with no reply, the following exchange occurred:

The victim: Want some space?

Defendant: I want to kill you

The victim: Why?

Defendant: Idk. I'm so..grrrr

The victim: Please try to put into words? I want to understand

[. . .]

Defendant: I don't have words[.] I just. Need

The victim: Okay . . . . wanting to kill me because. Will release sexual stress. Will help resolve frustration by taking the aggression out on me. Will make you feel better? The general idea

Defendant: Yes

The victim: Okay. What are you doing at the moment

Defendant: In the bathroom masterbating [sic]

[. . .]

The victim: Do you want me to die[.] I'm sorry you have to get off on [sic] the bathroom

Defendant: I can watch?

The victim:  [sent a photo of her breasts]  Maybe.

Defendant:  Yes or no

The victim:  I'm just asking questions.  Not offering yet

[. . .]

The victim:  How would you like me to [die]

Defendant:  Gun

The victim:  Which one

Defendant:  Revolver

The victim sent Defendant several photos showing her breasts bleeding with cuts, a photo of her breasts with "WHORE" written on them, and a photo of her breasts with a shotgun in her mouth.  The victim asked if Defendant would like seeing her die, to which he replied that he would.  The victim said she could choke herself to death, perhaps by hanging, and that Defendant could "[w]atch [her] turn the pretty colors[.]"  Defendant refused this and stated that he wanted her to use a "[g]un.  Naked.  With a plug in[.]"  The victim said, "I'll end for you.  Blowing my head off.  But no video chat with this.  I loose [sic] my nerve with you watching[.]  I want to be able to die for you."  Defendant said that he did not want the victim to die if he could not watch.  The victim offered to light herself on fire with gasoline.  Defendant said, "Only.  If.  I.  Can.  Watch."  The victim said there was a brush pile behind her apartment she could use to burn herself, and described it as "literally a witch burning."  Defendant said, "Gun.  Watching.  Or.  No.  Death."  The victim said, "Yes daddy[.]"  Defendant asked the victim if she would stop at his command; she replied that she would.  He asked if she wanted him to stop her, and the victim said it was up to Defendant, because this was for him.  The victim told Defendant she was "[g]etting naked," and sent him a picture of her breasts.  The messages reflect that the two had a video chat.

After the video chat, Defendant said, "Phew[.]  Lotsa [sic] pressure lifted[. . . .]  You follow orders so well[.]"  The victim replied, "I didnt [sic] kill myself.  So I suck at following orders[.]"  Defendant said, "I told you to stop before you did[.]  So you are great at following orders[.]"

On August 31, the victim asked Defendant whether he still wanted to kill her.  Defendant told her he did, though not as much as the day before.  The victim said she felt "pretty used," and specified that she meant that in a "bad" way.  She offered to hang herself

again, but Defendant said that he did not want her to die if she did not want to. The victim said, "What I want isn't important here. I want to serve you." Defendant replied, "My good girl." The victim said, "Your good girl [w]ill soon be a dead girl." Defendant said he wanted to watch. The two agreed that the victim would get naked and use a sex toy and a revolver, and they had a video call. Later that day, the victim told Defendant she was feeling much better because she had masturbated.

On September 4, the victim informed Defendant that she had wanted to kill herself the night before, but could not bring herself to do it. Defendant chastised her and said he wanted to beat her.

In the overnight hours on September 5, 2019, Defendant told the victim he was aroused, but the victim said she did not "feel any drive." Defendant instructed the victim to masturbate using specific sex toys and called her a "worthless whore." The victim expressed hesitation, but Defendant said, "Did I give you an option?" and "Are you going to follow orders like a good b[*]tch?" Defendant asked the victim whether she wanted to die, and she said no. Defendant sent the victim a photo of his erect penis, and the victim sent a photo of her breasts. Defendant told the victim that he had masturbated earlier while thinking of "stapling [her vagina] closed[.]" After more conversation along the same vein, the victim sent Defendant a photo of herself with a pistol in her mouth. Defendant asked the victim if she was masturbating and said, "Now your [sic] going to blow your head off for me[.]" Defendant said he wanted to watch, but the victim ended their role-playing session because she was feeling sick. The victim tried to go to sleep, but the two started messaging again an hour later. Defendant asked the victim whether he could "end" her and watch. He told her to "grab a gun" and video call when she was ready.

On September 20, the victim sent Defendant a myriad of nude photos of herself. Defendant asked the victim if she wanted him to "use" her, to which the victim replied she did, but she did not think she could engage in suicide play because she was "already so on edge of killing [her]self[.]" Defendant said, "The thought of you staying up all night just to blow your head off for me after an[] orgasm is super f[***]ing hot[.]" Defendant said he was feeling "aggressive. Very aggressive. Very very aggressive[.]" Defendant told the victim he would "grab [her] by the throat and smack [her] pretty face[.]" He said that he wanted to put a gun in the victim's mouth while they were having sex. Defendant said, "I really want that behind view now as you blow your head off[.]" Defendant agreed with the victim that he wanted to "crush [the victim] and end [her] into a [sic] insignificant pile of nothing[.]" The victim went to a sleep for a few hours, and they resumed messaging when she awoke. Defendant asked, "Would you like this to be the last one and I truly end you? As long as I can watch you actually end[.]" The victim said no. Defendant said, "Right now, I'm not horny, and I want to actually end you. That's my aggression level. I know you don't want that." Defendant told the victim he wanted to watch her "put a

vibrator on [her vagina] and blow [her] brains out[.]" Defendant said, "I'll kill you[. . . .] I'm not even playing[.]" Context suggests that the two had a video call, after which the victim said, "I don't think I'm okay. I'm starting to hyperventilate the moment we hung up[.]" The victim sent several messages with no response:

> Please don't leave me. I'm sorry I didn't do it. Please don't be mad. I tried to follow orders and I failed and I'm sorry. If you're mad at me I understand but please don't leave[. . . .] Promise me you'll still want to talk at the end of the day. When you dont [sic] feel guilty anymore. I'm sorry I didn't follow orders[.] I'm so sorry[.] I should have ended[.] You were trying to get me out of the way as easy as possible and I just. Am [sic] stupid[.]

After several hours, Defendant assured the victim that he would not leave her. The next day, the victim asked Defendant if they could stop engaging in "suicide play/edge play" for a[ ]long[,] long[,] while[.]" Defendant agreed to her request. The victim said that she felt "so bad after the other day," and that she "[had not] been right since[.]" Defendant said, "I used you harder than I have in years."

Later on September 21, the victim sent Defendant a picture of an alcoholic drink she was having. Defendant expressed his disappointment in the victim for consuming alcohol while she was underage. The victim told him that "[u]nderage wasn't a problem before," telling Defendant that he was being hypocritical and reminding him that she was "underage a long time and also escorted while underage."

On September 22, Defendant and the victim discussed his upcoming trip to Knoxville they had planned for the coming October. They were exploring sexual fantasies about what they would do when they were together, and reminisced about their sexual encounters when the victim visited Defendant in Indiana that summer. The victim wanted Defendant to "paddle" her, but expressed some hesitation about how far they would explore their fantasies. She said that she was "afraid [Defendant] wont [sic] stop when [she is] borderline and will actually seriously hurt her. . . . More then [sic] bruises and broken skin. Like. Fracture something or internal damage. Serious concussion. I dunno [sic]. It's just a fear[.]"

The victim told Defendant on September 25 that she had attempted to kill herself the night before. She said she "discovered [she] didnt [sic] care if [she] died," and "held the revolver to [her] head and wasnt [sic] afraid to die and [she] didnt [sic] care who [she] left behind[.]" She told him she did not follow through, however, and "took a shower and cut [her]self." She sent Defendant a photo of her breasts, bleeding with fresh cuts. Defendant told her the photo was "[b]eautiful[.]" Defendant asked the victim if she wanted him to "push," to which she replied she did not. The victim said, "I still havent [sic]

recovered really from last time. It opened old wounds." The victim told Defendant that her "numbers" were an "8" on the depression scale and an "8" on the suicidal scale. Defendant agreed with the victim's statement that he "want[ed] to take [his] anger out on [the victim]. Sexually[.]" Defendant told the victim he wanted to urinate on her and in her mouth. The victim said she was getting aroused and sent Defendant several nude photographs.

Defendant and the victim explored a few other topics germane to this appeal in the messages introduced at trial. They were disappointed when the plans for Defendant's trip to Knoxville fell through because Defendant could not find someone to cover his shifts as a bouncer at a strip club. The two also expressed their fantasy of Defendant raping the victim. Defendant repeatedly said that he wanted to beat the victim, and the victim said she liked that. They discussed how the victim had her nipples pierced as a means of "marking" her, that is, to show Defendant's ownership over her.

*The Victim's Death*

In the early afternoon of September 29, 2019, the victim sent Defendant two videos of herself in a dance class. After some small talk, Defendant asked the victim for her "numbers." The victim said she was at a "6" on the depression scale and a "4" on the suicidal scale. Defendant asked the victim if she would "end" for him when she got home, to which she replied she would. The victim asked Defendant if he wanted her to die, and he said he did. Defendant said, "I want to kill you. . . . I need it. . . . To come. To get my aggression out. To make sure no[ ]one ever has you again." Defendant asked, "Are you actually able to do it," and the victim replied, "Have I ever[.]" The victim said she was sorry she had "reached back out to [Defendant]." Defendant said, "Are you sorry enough to pull the trigger? . . . Hmmm. I dont [sic] think so. Which is good. . . . Because you'll always be around for me to torture[.]" The victim told Defendant she wanted him to "[m]ake [her] cut [her]self and [Defendant] enjoy watching. Make [her] hate [her]self. Ruin [her][.]" Defendant said, "I want to watch you pull the f[***]ing trigger [c*]nt[.]"

The victim said, "Want me to die naked and horny for you[?]" Defendant replied that he wanted the victim to die on her knees and instructed her to use a revolver. The victim asked Defendant whether he wanted her to play Russian roulette. Defendant said, "Doesnt [sic] really work with your gun huh[.] . . . You can see the bullet[.]" The victim offered to close her eyes or use a blindfold if he wanted her to. The victim said, "You could decide if youre [sic] going to kill.me [sic] or not and I just have to listen[.]" Defendant asked the victim whether this thought aroused her. She said that the thought of her death did not, but the thought of serving him did. Defendant told the victim he had an erection, that his heart rate was elevated, that he could feel adrenaline, and that he was "salivating[.]" The victim said, "I trust you not to actually kill me[.] . . . But to enjoy the

trust and power youd [sic] be holding[.]" On Defendant's request, the victim said her "numbers" were a "7" on the depression scale and a "6" on the suicidal scale, which were higher than she had reported to him earlier.

The victim said she was afraid but that she trusted Defendant. She said the fear was arousing. Defendant said, "If I push now, I have to kill you. I have to end you, because I know that the mental anguish it would put you back into especially with me not being able to aftercare would be way too much. . . . Right now. I really really honestly want to kill you." The victim asked whether she would be in danger when he came to visit, and Defendant said he did not know. Defendant said,

> Part of me also wants to kill you over this so I cant [sic] get in trouble[.] . . . Will you die for me? . . . Can you follow orders? . . . Turn off your brain amd [sic] just follow[.] . . . If you can follow orders, and pull the trigger quickly, no terror or panic, I could do it. But I cant [sic] break you[.]

The victim said she loved Defendant and "[t]his is to serve [Defendant] and be good for [him][.]" The victim told Defendant that she was an "8" on the depression scale and an "8" on the suicidal scale. Defendant asked, "Can you do it? By orders. Yes or no[.]" The victim said she wanted Defendant to "use" her. Defendant said, "No. I want to kill you. That's all I f[***]ing want[,] [i]s to f[***]ing end you[.]" The victim said, "Kill me then. We can do the roulette and I won't know where it is and you can kill me." Defendant told the victim he wanted her to be topless.

The two began a video call that ended at 3:48 p.m.[4]

Defendant called 911 at 4:03 p.m. and reported the victim's suicide, and officers were dispatched to her apartment. Officer Christopher Medina, with the Knoxville Police Department ("KPD"), was the first officer to arrive on the scene. When he arrived at the address that Defendant gave to the 911 dispatcher, he knocked on the door. The victim's father answered. Officer Medina asked him whether there were any other people in the apartment, and the victim's father said there were. He led Officer Medina to a bedroom, the door to which was closed. They opened the door and saw the victim, dead and topless, sitting on the bed with her legs crossed. She was slumped forward with her head and a Ruger .357 revolver in her lap, lying in a pool of blood. One spent .38 special casing was in the gun's cylinder. The victim's cell phone was propped up on a pillow against the wall, facing the victim. Officer Medina called emergency medical services ("EMS"), who attempted lifesaving measures, but the victim was already dead. Photographs of the victim,

---

[4] A recording of this video call, if one even exists, is not in the record and was not admitted at trial.

taken after EMS had repositioned her body for lifesaving measures, were admitted as exhibits at trial.

The victim's father was surprised when they found the victim dead in her bedroom. When KPD Investigator Chas Terry, this case's lead investigator, arrived at the apartment, the victim's father told him that he had heard a "pop" but thought nothing of it because they had cats in the apartment. He believed that one of the cats had knocked something over.

KPD officers searched the apartment and found a gun safe with several long guns and pistols along with boxes of ammunition. The officers found other firearms in the victim's bedroom besides the revolver she used to shoot herself. One of the guns found in the victim's bedroom was the semiautomatic pistol with which the victim had previously sent Defendant a picture pointed in her mouth.

Dr. Amy Hawes, at the time a Knox County assistant medical examiner, performed a limited autopsy on the victim. Dr. Hawes determined that the victim's cause of death was a gunshot wound to the head and her manner of death was a suicide. Several photos taken during the autopsy were admitted as exhibits at trial. One of the photographs showed a gunshot entry wound in the victim's mouth. Dr. Hawes recovered bullet fragments from the victim's head.

*Investigator Terry's Investigation*

Investigator Terry took the victim's laptop to KPD headquarters, where he downloaded the victim's Facebook records and obtained the conversations between her and Defendant. As Investigator Terry began his investigation into the victim's death, he listened to a recording of the 911 call Defendant had placed. Investigator Terry noted some inconsistencies between what Defendant told the 911 dispatcher and what Defendant's and the victim's Facebook messages reflected. For example, Defendant told the 911 dispatcher that he and the victim had been on the video call for six minutes and that the victim had shot herself two minutes before he called 911. The timestamps on the Facebook messages, however, revealed that around fifteen minutes elapsed between the end of the video call and when Defendant called 911.

Investigator Terry traveled with another investigator to Bloomington, Indiana, where Defendant lived, in February 2020 to arrest Defendant after the Knox County Grand Jury had returned a presentment charging Defendant with criminally negligent homicide and false report. Investigator Terry coordinated with the Bloomington Police Department ("BPD") to bring Defendant into custody.

- 12 -

Defendant was taken to BPD headquarters after his arrest, where Defendant waived his *Miranda* rights and agreed to speak with Investigator Terry. Defendant told Investigator Terry that their suicide play was an outlet for the victim and made her feel wanted. Regarding their suicide play on September 29, Defendant said the victim started playing a video called "Hurt," and started "getting extreme." According to Defendant, the victim said she "didn't want to do this anymore" and he "begged her not to." Defendant told Investigator Terry that he was "trying to talk her down" because the victim was saying that no one would ever love her. Defendant claimed he saw the victim grab a bullet and he said "don't f[***]ing do it," but the victim moved the camera and he heard a gunshot, after which he called 911. Investigator Terry testified at trial that the victim's cell phone's position in her bedroom when police found her was inconsistent with Defendant's statement in his interview that she moved the camera. Investigator Terry told Defendant he thought he was lying and told Defendant to "own his sh[*]t" rather than "manufactur[ing] some sh[*]t that you think is acceptable." Defendant said, "I didn't want her to f[***]ing die." Investigator Terry reminded Defendant that he told the victim that he wanted to "f[***]ing destroy [her]" and "end" her. Investigator Terry said, "There was something else going on with you that day. You didn't want to play. You wanted her to f[***]ing do it." He asked Defendant, "You have to make me understand this part. What pushed you to the point where you pushed her there?" Defendant replied, "She wanted it." Investigator Terry disagreed and said, "You wanted it. She wanted anything you wanted [Defendant]." Defendant said, "I didn't want her to die. F[***]. I screamed at her." Investigator Terry said, "You know what [Defendant], it don't [sic] count when you scream after the person is dead."[5]

### *Trial, Verdict, and Sentencing*

The State presented the above proof in its case-in-chief. Defendant moved for a judgment of acquittal on both counts of the presentment, and the trial court granted Defendant's motion as to the false report charge. *See* Tenn. R. Crim. P. 29. Defendant elected not to testify after proper inquiry with counsel.

The defense called James Landreth, the victim's boyfriend, as a witness at trial. Mr. Landreth testified that the victim lived with him in his apartment in Knoxville and that he was deployed in connection with his military duty on September 29, 2019. Mr. Landreth met the victim on a website called "Seeking Arrangements" in 2017, which he described as a website for "sugar-daddy-type relationships." Mr. Landreth also described the website

---

[5] At this point, though not reflected in the video shown to the jury, Defendant invoked his right to counsel and the interrogation ended. The video shown to the jury ended after Investigator Terry said "it don't count when you scream after the person is dead." The unredacted video of Defendant's and Investigator Terry's interview was the subject of a pretrial motion to suppress. The trial court suppressed Defendant's invocation of his right to counsel and everything after.

- 13 -

as "a prostitution website," and said the victim was on the website for that purpose. When Mr. Landreth met the victim, she did not tell him she was 17 years old. According to Mr. Landreth, he stopped talking to the victim once he discovered that she was 17 years old. The victim moved into Mr. Landreth's apartment in Knoxville shortly after her 18th birthday.

Mr. Landreth testified that the victim liked to engage in a "BDSM lifestyle," that is, she liked "bondage," "sadomasochism," and "receiving a certain amount of pain during sex[.]" According to Mr. Landreth, the victim had a troubled past about which she told him. Mr. Landreth said that he told the victim shortly before her death that he did not want her to speak to Defendant any longer.

On cross-examination, Mr. Landreth stated that he and the victim did not engage in suicide play as part of their sexual life, but that their relationship was primarily focused on "dominance." Mr. Landreth and the victim never engaged in sexual role play involving guns. He did not believe that the victim was suicidal when he left for his deployment before her death.

A jury convicted Defendant of criminally negligent homicide as charged in the presentment. The trial court ordered Defendant to serve two years in confinement after a sentencing hearing and denied judicial diversion, although the court found that Defendant was eligible. The trial court said that "this whole idea of somebody committing suicide, to achieve sexual release is – is the height of evilness, in this [c]ourt's mind," and expressed its belief that a longer sentence would have been warranted here if the law permitted it.

Defendant appeals.

### *Analysis*

Defendant argues on appeal that: (1) the evidence is insufficient to support his conviction because (a) the State did not prove that Defendant's actions were the proximate cause of the victim's death, and (b) the negligent homicide statute as construed here violates the First Amendment to the United States Constitution; (2) the State did not establish territorial jurisdiction over Defendant because he was in Indiana at the time of the victim's death; (3) the trial court erred in admitting a hearsay statement by the investigator; (4) the trial court erred in allowing the jury to utilize a transcript of Defendant's interrogation that contained inaccurate transcriptions; (5) cumulative error requires a new trial; and (6) the trial court erred in denying judicial diversion because it relied on evidence not in the record. We address each issue in turn.

*Sufficiency of the Evidence*

Defendant raises two issues as to sufficiency. First, he argues that the State did not prove beyond a reasonable doubt that his actions proximately caused the victim's death. Second, he argues that his conviction cannot stand because it was based on words alone and therefore violates the First Amendment to the United States Constitution. The State argues that "[h]e is wrong on both counts." We agree.

When examining whether the evidence presented at trial was sufficient to support a conviction, several well-settled principles guide our analysis. We determine "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original); *see also* Tenn. R. App. P. 13(e). A guilty verdict removes the presumption of innocence and replaces it with a presumption of guilt. *State v. Evans*, 838 S.W.2d 185, 191 (Tenn. 1992). The defendant bears the burden on appeal to demonstrate that the evidence is insufficient to support his conviction. *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982).

"[A] jury verdict, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *State v. Harris*, 839 S.W.2d 54, 75 (Tenn. 1992). The State is entitled on appeal to "the strongest legitimate view of the evidence and to all reasonable and legitimate inferences that may be drawn therefrom." *State v. Elkins*, 102 S.W.3d 578, 581 (Tenn. 2003). As such, this Court is precluded from re-weighing or reconsidering the evidence when evaluating the convicting proof. *State v. Morgan*, 929 S.W.2d 380, 383 (Tenn. Crim. App. 1996); *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Moreover, we may not substitute our own "inferences for those drawn by the trier of fact from circumstantial evidence." *Matthews*, 805 S.W.2d at 779. Questions as to the credibility of witnesses and the weight of the evidence, as well as factual issues raised by such evidence, are resolved by the trier of fact, not this Court. *State v. Pruett*, 788 S.W.2d 559, 561 (Tenn. 1990). These principles guide us "'whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

Under Tennessee law, a person commits criminally negligent homicide when his criminally negligent conduct results in a death. T.C.A. § 39-13-212(a).

> "Criminal negligence" refers to a person who acts with criminal negligence with respect to the circumstances surrounding that person's conduct or the result of that conduct when the person ought to be aware of a substantial and unjustifiable risk that the circumstances exist or the result will occur. The

risk must be of such a nature and degree that the failure to perceive it constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the accused person's standpoint.

*Id.* § 39-11-106(a)(5).

## A. Proximate Cause

Our supreme court has recognized that implicit in the criminally negligent homicide statute's language "results in a death" is the requirement that the defendant's actions must proximately cause the victim's death. *State v. Farner*, 66 S.W.3d 188, 199 (Tenn. 2001). Proximate cause is established if the victim's death was a "natural and probable consequence" of the defendant's conduct. *Id.* at 203. The defendant's actions need not be the sole or the immediate cause of the victim's death. *Id.* (citing *Letner v. State*, 299 S.W. 1049, 1051 (Tenn. 1927)). In fact, proximate cause is established even if a direct cause of the victim's death was the victim's action, but the victim's action was a natural and probable consequence of the defendant's action. *Farner*, 66 S.W.3d at 206 (quoting *Letner*, 299 S.W. at 1051).

Tennessee courts have yet to consider the specific question of whether a defendant proximately causes a victim's death when he encourages or coerces the victim to commit suicide.[6] However, Tennessee courts have held that a person who convinces another to engage in a highly dangerous activity can be prosecuted for criminally negligent homicide if the victim dies by engaging in such activity. In *Farner*, cited above, the defendant convinced the victims to drag race their cars. 66 S.W.3d at 192-93. During the race, the victims lost control of their vehicle, crashed, and died. *Id.* Though the defendant was not physically involved in the crash that took the victims' lives, our supreme court held that the evidence was sufficient to support the defendant's conviction for criminally negligent homicide because he convinced them to engage in a highly dangerous activity, and the jury was entitled to conclude that the victims' crash and ultimate deaths were a natural and

---

[6] Perhaps the landmark case in this arena is *Commonwealth v. Carter*, 115 N.E.2d 559 (Mass. 2019), in which the Supreme Judicial Court of Massachusetts affirmed the defendant's conviction for involuntary manslaughter where the defendant repeatedly sent text messages to the victim urging him to kill himself. Most states have criminal statutes addressing assisted, encouraged, or coerced suicide, though not all would apply to Defendant's conduct here. For a survey of these statutes as they existed in 2019, see Robert Rivas, Final Exit Network, Survey of State Laws Against Assisting in a Suicide (2019), https://web.archive.org/web/20200215082151/http://www.finalexitnetwork.org/Survey_of_State_Laws_Against_Assisting_in_a_Suicide_2019_update.pdf.

.

- 16 -

probable consequence of engaging in the drag race. *Id.* at 205. Interestingly, the court cited with approval two cases in which other states' courts upheld involuntary manslaughter convictions (the soul sister to criminally negligent homicide) where the defendants participated in games of Russian roulette with the victims, who were killed. *Id.* at 202 (citing *People v. Hansen*, 59 Cal. App. 4th 473 (Cal. Crim. App. 1997) and *Commonwealth v. Atencio*, 189 N.E.2d 223 (Mass. 1963)).

The proof here, viewed in the light most favorable to the State, established that Defendant and the victim spent the entire late summer of 2019 playing suicide games for Defendant's diabolical sexual pleasure. On September 29, 2019, Defendant asked the victim how suicidal she felt and whether she would "end" for him. Defendant told the victim he wanted her to die. He wanted the victim to play Russian roulette while he watched, but lamented that it would not work with the victim's gun because she could see where the bullet was in the cylinder. The victim offered to use a blindfold or close her eyes, thereby allowing Defendant to decide whether she lived or died. The victim told Defendant that the proposition of her death did not arouse her, but the thought of serving him did. At this thought, Defendant told the victim that he had an erection, that his heart rate was elevated, and that he could feel the adrenaline. The victim told Defendant that *she trusted him not to let her die.* The victim's suicidal feelings increased more and more as they grew closer to their video call. The victim had told Defendant a few days prior that she did not want to suicide play for a long time because she felt suicidal "for real" as opposed to engaging in role play—in fact, she had recently told Defendant that he was "playing with fire" by pushing her to engage in his twisted suicide sex games. Defendant repeatedly told the victim before their video call that he "really really" wanted to kill her so he would not "get in trouble." The two started a video call, and the victim died by shooting herself in the head.

To be sure, as Defendant points out, the jury did not see a recording of the video call in which the victim died, and no such recording is in the record, if it even exists. Ultimately, however, it does not matter. As the State pointed out at oral argument, the video call was a play, and the messages were the stage directions. The jury was entitled to infer based on the Facebook messages that Defendant grossly deviated from the standard of care by convincing the already-suicidal victim to engage in Russian roulette where the victim either was blindfolded or closed her eyes, thereby amplifying the danger of an already highly dangerous activity. The victim died while engaging in this dangerous activity. The jury was entitled to conclude that Defendant's conduct was a gross deviation from the standard of care that Defendant assumed and that the victim's death was a natural and probable consequence of such a gross deviation. This evidence would have been sufficient had the victim merely died in a game of Russian roulette with Defendant; much more is it sufficient here where Defendant actively incited and encouraged the victim to commit suicide for his depraved sexual gratification. This evidence was amply sufficient

to support Defendant's conviction for criminally negligent homicide, and he is not entitled to relief on this issue.

## B.  Constitutional Challenge

Defendant argues that the criminally negligent homicide statute, as construed in this case, violates the First Amendment because his conviction is based on words alone. Defendant raises this constitutional challenge, adorned as a challenge to the sufficiency of the evidence, for the first time on appeal.  It is therefore waived.  *See State v. Rhoden*, 739 S.W.2d 6, 10 (Tenn. Crim. App. 1987); *State v. Tanner*, No. M2018-00639-CCA-R3-CD, 2019 WL 2065120, at *1 (Tenn. Crim. App. May 9, 2019), *no perm. app. filed*; *see also* Tenn. R. Crim. P. 12(b)(2)(B) (stating that motion alleging defect in indictment, presentment, or information must be raised pretrial); *id.* 12(f)(1) ("[A] party waives any defense . . . by failing to comply with . . . rules requiring such matters to be raised pretrial[.]").  Defendant is not entitled to relief on this issue.

### *Territorial Jurisdiction*

Defendant argues that the State did not establish territorial jurisdiction over him because Defendant was in Indiana at the time of the victim's death and only communicated with her via electronic means.  We disagree.

"It is elementary that before a court may exercise judicial power to hear and determine a criminal prosecution, that court must possess three types of jurisdiction: jurisdiction over the defendant, jurisdiction over the alleged crime, and territorial jurisdiction."  *State v. Legg*, 9 S.W.3d 111, 114 (Tenn. 1999).  "When an offense is commenced outside of this state and consummated in this state, the person committing the offense is liable for punishment in this state in the county in which the offense was consummated[.]"  T.C.A. § 39-11-103(b)(1); *see also Legg*, 9 S.W.3d at 115.  "It is no defense that the person charged with the offense was outside of this state when the offense was consummated, if the person used . . . [o]ther means proceeding directly from the person."  T.C.A. § 39-11-103(b)(2)(B).  Territorial jurisdiction is a question of fact for the jury and must be proven beyond a reasonable doubt.  *State v. Beall*, 729 S.W.2d 270, 271 (Tenn. Crim. App. 1986); *see also State v. Hufford*, No. M2018-01823-CCA-R3-CD, 2019 WL 6768717, at *6 (Tenn. Crim. App. Dec. 12, 2019), *perm. app. denied* (Tenn. Apr. 15, 2020).

The crux of Defendant's argument is his assertion that communicating with the victim through Facebook Messenger or video call is not a "means proceeding directly from the person" as contemplated by Tennessee Code Annotated section 39-11-103(b)(2)(B). This is therefore a question of statutory construction.

"The most basic principle of statutory construction is to ascertain and give effect to the legislative intent without unduly restricting or expanding a statute's coverage beyond its intended scope." *State v. Howard*, 504 S.W.3d 260, 269 (Tenn. 2016) (quoting *Owens v. State*, 908 S.W.2d 923, 926 (Tenn. 1995)). "When statutory language is clear and unambiguous, we must apply its plain meaning in its normal and accepted use, without a forced interpretation that would extend the meaning of the language. . . ." *Carter v. Bell*, 279 S.W.3d 560, 564 (Tenn. 2009) (citation omitted); *Eastman Chem. Co. v. Johnson*, 151 S.W.3d 503, 507 (Tenn. 2004). A statute is ambiguous when "the parties derive different interpretations from the statutory language." *Howard*, 504 S.W.3d at 270 (quoting *Owens*, 908 S.W.2d at 926). If a statute is ambiguous, this Court "'may reference the broader statutory scheme, the history of the legislation, or other sources' to determine the statute's meaning." *State v. Frazier*, 558 S.W.3d 145, 153-54 (Tenn. 2018) (quoting *State v. Sherman*, 266 S.W.3d 395, 401 (Tenn. 2008)).

There can be no question that the homicide was consummated in Tennessee because the victim died in Tennessee. *See Hufford*, 2019 WL 6768717, at *6. Rather, our focus is on whether electronic messaging or video calling constitutes "means proceeding directly from the person" for purposes of territorial jurisdiction.

Only one Tennessee case, cited by both parties in support of their respective positions, interprets this specific statutory provision. In *State v. Johnson*, No. M2005-02855-CCA-R3-CD, 2006 WL 3498046, at *1 (Tenn. Crim. App. Nov. 21, 2006), *no perm. app. filed*, a panel of this Court determined that there was no territorial jurisdiction over a second-degree murder in connection with a fentanyl transaction that occurred, coincidently, in Indiana. After buying fentanyl from the defendant in Indiana, the victim traveled to Clarksville, Tennessee, where he consumed it and died. *Id.* At no point in connection with the case did the defendant enter Tennessee. *Id.* at *3. The *Johnson* court found territorial jurisdiction lacking because

> the [territorial jurisdiction] statute requires an affirmative action on the part of the [defendant] to effectuate the crime in Tennessee. The facts in this case do not establish that the [defendant] intended the drugs to enter the State of Tennessee, nor is there any evidence in the record that the [defendant] knew the victim was planning to travel to Tennessee.

*Id.* at *5. The panel's analysis drew heavily on reasoning from *State v. Palermo*, 579 P.2d 718, 720 (Kan. 1978), in which the Kansas Supreme Court held similarly. The panel quoted with approval language from *Palermo* stating that Kansas did not have jurisdiction over the defendant because he

was located outside the state, did not intend to commit a crime within the state, and could not reasonably foresee that his act would cause, aid or abet in the commission of a crime within that state.

*Johnson*, 2006 WL 3498046, at *6 (quoting *Palermo*, 579 P.2d at 720). The panel found that "our territorial jurisdiction statute incorporates this reasoning" because the statutes were similar. *Johnson*, 2006 3498046, at *6.

Defendant claims that "means proceeding directly from the person" implies only a physical action, such as "firing a gun across a border, dumping poison in a river, or mailing a pipe bomb[.]" *Cf. Johnson*, 2006 WL 3498046, at *5 n.4 ("A case in which a person outside the state uses 'other means' proceeding directly from the person would be similar to one wherein that person fires a gun across state lines to kill another person."). However, neither the statute nor *Johnson* so limits the statutory reach. The *Johnson* panel focused on "affirmative action on the part of the defendant to effectuate the crime in Tennessee," not affirmative *physical* action only.

We hold that electronic communications are "means proceeding directly from the person" for purposes of establishing territorial jurisdiction. Here, that is Defendant's use of Facebook Messenger and video calls in which he pushed the victim to engage in Russian roulette for his perverted sexual pleasure. Defendant affirmatively reached out to Tennessee via electronic means and caused the victim's death to occur in Tennessee. In so holding, we make no new rule; we merely apply an old principle to a new set of facts. Defendant is not entitled to relief on this issue.

*Admission of Alleged Hearsay*

Defendant argues that the trial court improperly allowed the State to admit hearsay evidence; specifically, Investigator Terry's statement to Defendant, "it don't count when you scream after the person is dead." The State argues that Defendant has waived consideration of the issue and, alternatively, that the trial court properly admitted the statement because it was not offered for the truth of the matter asserted therein.

Hearsay is an out-of-court statement offered in court to prove the truth of the matter asserted therein. Tenn. R. Evid. 801. It is axiomatic, then, that if a statement is not offered to prove the truth of the matter asserted, it is not hearsay. That said, there are a litany of exceptions to the hearsay rule. *See id.* 803, 804. It is also common for investigators' statements made during interrogations to be admitted under the theory that they give context to a defendant's statements or reflect on the listener's (i.e., the defendant's) state of mind. *See State v. Venable*, 606 S.W.2d 298, 201 (Tenn. Crim. App. 1980) (holding

that statement admitted to show its effect on the listener was not hearsay because it was not offered for its truth).

As an initial matter, we address the State's argument that Defendant has waived plenary review of this issue. The State contends that Defendant sought to suppress the statement in connection with his invoking his right to counsel rather than on hearsay grounds. Our review of the record shows that Defendant's pretrial motion to suppress the statement in question was based on Defendant's invocation of his right to counsel. The trial court held a hearing on this motion and suppressed all of Investigator Terry's statements made after the statement at issue here (i.e., "it don't count. . . ."). We note that the only discussions about hearsay at the suppression hearing were about other statements, chiefly made by the victim. The trial court stated in its written order that "[t]he defense objects primarily on hearsay and relevance grounds." However, neither Defendant's written motion nor counsel's oral assertions at the suppression hearing suggest that the motion to suppress this statement relied on hearsay grounds. Defendant's motion for new trial does not raise hearsay as a ground for his allegation that the trial court erred in admitting this statement.

"It is elementary that a party may not take one position regarding an issue in the trial court, change his strategy or position mid-stream, and advocate a different ground or reason in this Court." *State v. Dobbins*, 754 S.W.2d 637, 641 (Tenn. Crim. App. 1988). This issue is therefore waived. Defendant has not requested plain-error review of this issue, so we decline to address it. Even if the issue were properly preserved, Investigator Terry's statement "it don't count when you scream after the person is dead" was not offered for the truth of the matter asserted therein, so it is not hearsay. Defendant is not entitled to relief on this issue.

*Transcript of Defendant's Interview*

Defendant complains that the trial court erred in allowing the jury to utilize a transcript of his interview with Investigator Terry that contained inaccuracies. The State counters that the trial court did not err because it instructed the jury that the video recording, not the transcript, was the evidence in this case and that the jury should rely on the video if it believed it conflicted with the transcript. We agree with the State.

A jury may be given a transcript of a recorded interview to use as an aid when listening to the recording. *State v. Barnard*, 899 S.W.2d 617, 623-24 (Tenn. Crim. App. 1994). The trial court must instruct the jury that the recording, not the transcript, is the actual evidence. *Id.*; *see also State v. Swift*, No. W2018-00054-CCA-R3-CD, 2019 WL 1417870, at *9 (Tenn. Crim. App. Mar. 28, 2019), *no perm. app. filed*. The trial court is

not required to authenticate the transcript before allowing the jury to use it. *State v. Walker*, 910 S.W.2d 381, 394 (Tenn. 1995).

The record here indicates that someone in the District Attorney General's Office prepared a transcript of Defendant's interview with Investigator Terry. The trial court allowed the jury to use the transcript while it watched the video recording of Defendant's interview. The trial court instructed the jury before it received the transcript that the transcript was only an aid, that the video recording was the actual evidence, and that if the jury believed the two conflicted, it should believe the video recording. At one point while the video was being played for the jury, counsel for Defendant objected based on what he believed were inaccuracies in the transcript. Counsel said that he noticed the inaccuracies when he reviewed the transcript before trial, but "assumed it would be fixed." He complained primarily of one portion of the transcript:

> [INVESTIGATOR TERRY]: You didn't give a sh[*]t about her dying that day, and you know what, I'm fine with that, because there was something different about you. There was something going on with you.
>
> [DEFENDANT]: That's true.

Defendant asserted at trial and asserts now on appeal that in the video recording, he said, "I didn't want her to die. I f[***]ing miss her."[7] The trial court overruled Defendant's objection. The trial court collected the transcripts from the jury at the conclusion of Investigator Terry's testimony, and the jury had access only to the video recording during deliberations.

As mentioned above, the trial court instructed the jury that the transcript was only an aid and that the video recording was the evidence in this case. It instructed the jury that if the jury believed there was a conflict between the transcript and the video the jury should disregard the transcript and view the video recording as authoritative.[8] The trial court did exactly as was required of it, even assuming for argument's sake that the transcript was inaccurate on this point. Additionally, Defendant has demonstrated no prejudice arising from this alleged transgression. Defendant is not entitled to relief on this issue.

---

[7] Our review of the video recording reveals that Defendant's assertion as to what he said is correct, though as we explain later, it matters not in our analysis.

[8] The State mentions in its brief that "Defendant tries to have the audibility of the interview both ways, asserting that portions are so inaudible that the jury would have to view the transcript as authoritative while simultaneously suggesting it clearly is contrary to the transcript. Both cannot be true." We agree with the State on this point, though it does not affect our analysis of this issue.

*Cumulative Error*

The cumulative error doctrine recognizes that multiple errors in a trial may exist that are harmless standing alone, but implicate a defendant's right to a fair trial when aggregated. *State v. Hester*, 324 S.W.3d 1, 76 (Tenn. 2010) (citations omitted). Because we find no error on the trial court's part in the issues Defendant raises (much less multiple), he is not entitled to cumulative error relief.

*Denial of Judicial Diversion*

Finally, Defendant argues that the trial court erred in denying judicial diversion, despite his eligibility, because the trial court relied on evidence that was not presented at the sentencing hearing. The State argues that the trial court properly denied diversion, and we agree.

A defendant is eligible for judicial diversion if he is found guilty or pleads guilty or nolo contendere to a Class C, D, or E felony, has not been previously convicted of a felony or a Class A misdemeanor, has not been previously granted judicial or pretrial diversion, and is not seeking deferral for certain sexual offenses. *See* T.C.A. § 40-35-313(a)(1)(B)(i). "Eligibility under the statute does not, however, constitute entitlement to judicial diversion; instead, the decision of whether to grant or deny judicial diversion is entrusted to the discretion of the trial court." *State v. King*, 432 S.W.3d 316, 323 (Tenn. 2014). The trial court must consider several common-law factors:

> "(a) The accused's amenability to correction, (b) the circumstances of the offense, (c) the accused's criminal record, (d) the accused's social history, (e) the accused's physical and mental health, and (f) the deterrence value to the accused as well as others. The trial court should also consider whether judicial diversion will serve the ends of justice—the interests of the public as well as the accused."

*Id*. at 326 (quoting *State v. Parker*, 932 S.W.2d 945, 958 (Tenn. Crim. App. 1996)). "[T]he trial court must weigh the factors against each other and place an explanation of its ruling on the record." *Id*. (citing *State v. Electroplating, Inc.*, 990 S.W.2d 211, 229 (Tenn. Crim. App. 1998)).

When the trial court considers the common law factors, "specifically identifies the relevant factors, and places on the record its reasons for granting or denying judicial diversion," then this Court will "apply a presumption of reasonableness and uphold the grant or denial so long as there is any substantial evidence to support the trial court's decision." *Id*. at 327. Our supreme court has explained:

Although the trial court is not required to recite all of the *Parker* and *Electroplating* factors when justifying its decision on the record in order to obtain the presumption of reasonableness, the record should reflect that the trial court considered the *Parker* and *Electroplating* factors in rendering its decision and that it identified the specific factors applicable to the case before it. Thereafter, the trial court may proceed to solely address the relevant factors.

*Id*. Failure to consider the common law factors results in a loss of the presumption of reasonableness, and this Court will either conduct a de novo review or remand the case to the trial court for reconsideration. *Id*.

The parties do not dispute that Defendant was eligible for judicial diversion. Defendant focuses on one statement the trial court made as it weighed deterrence:

This is the first time I've ever had a case like this. And I think that it probably goes on a lot more than we're aware of. We just rarely find out about it, either before or after the death of the victim. And so I do think that this is behavior that occurs frequently, but does not result in death, where there's statements being made online, either in a bullying nature or, in this case, an opportunity or desire to seek gratification. I do think that it would be less of a deterrent value to others if diversion would be granted in this case.

Defendant claims this "ungrounded speculation" requires us to vacate the trial court's denial of judicial diversion, as if the trial court's decision to deny diversion was grounded exclusively in this factor. This is a mischaracterization. The trial court carefully and thoroughly weighed each *Parker*/*Electroplating* factor and explained the weight it gave to each factor. The trial court focused primarily on the circumstances of the offense as it related to the interest of justice—indeed, this was the primary factor on which the trial court relied in denying judicial diversion. The trial court did exactly as was required of it in making this determination and did not abuse its discretion. Judicial diversion is not an entitlement. Defendant is not entitled to relief on this issue.

## CONCLUSION

We hold that the evidence is sufficient to support a conviction for criminally negligent homicide where the defendant encourages or coerces a victim to commit suicide and that person commits suicide. We further hold that electronic communications are "other means proceeding directly from the person" for the purpose of establishing territorial jurisdiction. The trial court did not err in allowing the jury to utilize transcripts

of Defendant's interview.  Further, Defendant is not entitled to cumulative error relief.  The trial court did not err denying Defendant judicial diversion.  Finally, Defendant waived his constitutional challenge and his hearsay argument.  For all the reasons discussed above, we affirm the judgment of the trial court.


_____
TIMOTHY L. EASTER, JUDGE